STEVEN E. YOUNG (BAR NO. 63278)
steven.young@ffslaw.com
JOHN D. VAN ACKEREN (BAR NO. 240739)
john.vanackeren@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone:  (310) 255-6100
Facsimile:  (310) 255-6200

Attorneys for Plaintiff CORINNE
SOLOMON

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CORINNE SOLOMON, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>BRETT JACOBSON, an individual; LOTTO LOTTO GAMZ ETC., INC., a Delaware corporation; and DOES 1 through 25, inclusive,<br><br>　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br>1.　**SECURITIES FRAUD – VIOLATION OF SEC RULE 10(b);**<br>2.　**BREACH OF FIDUCIARY DUTY;**<br>3.　**FRAUD;**<br>4.　**CONSTRUCTIVE FRAUD;**<br>5.　**NEGLIGENT MISREPRESENTATION;**<br>6.　**RESCISSION;**<br>7.　**BREACH OF WRITTEN CONTRACT;**<br>8.　**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>9.　**CONVERSION;**<br>10.　**UNJUST ENRICHMENT; AND**<br>11.　**ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Corinne Solomon ("Solomon") hereby complains against Defendants Brett Jacobson ("Jacobson"), Lotto Lotto Gamz Etc., Inc. ("Lotto"), and Does 1 through 25 as follows:

## JURISDICTION AND VENUE

1.　　This action arises under Section 10(b) of the Securities Exchange Act

2506155.3 25052-200

1  of 1934 and Rule 10b-5 thereunder (17 C.F.R. 240.10b-5 and 28 U.S.C. § 1331).

2  　　　　2.　　Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and

3  (2).

4  　　　　　　　　　　　**PARTIES**

5  　　　　3.　　Solomon is and was at all times mentioned herein a citizen of the State

6  of California.

7  　　　　4.　　Solomon is informed and believes, and based thereon alleges, that

8  Jacobson is and was at all times mentioned herein a citizen of the State of

9  California.

10  　　　　5.　　Solomon is informed and believes, and based thereon alleges, that

11  Lotto is a corporation incorporated under the laws of the State of Delaware, having

12  its principal place of business in the State of California.

13  　　　　6.　　Solomon is informed and believes, and based thereon alleges, that at all

14  times mentioned herein, Jacobson exercised control over Lotto, including, but not

15  limited to, the solicitation of investors, the solicitation of potential directors and

16  officers, and its operations.

17  　　　　7.　　Solomon is ignorant of the true names and capacities of Defendants

18  sued herein as Does 1-25, inclusive and, therefore, sues said Doe Defendants by

19  such fictitious names.  Solomon will amend this Complaint to state the true names

20  and capacities when the same have been ascertained.  (Jacobson, Lotto, and DOES 1

21  through 25, inclusive, are sometimes collectively referred to herein as

22  "Defendants").

23  　　　　8.　　Solomon is informed and believes, and based thereon alleges, that each

24  of the Defendants named herein was the agent, servant, or employee of each of the

25  other Defendants, and was acting within and pursuant to such agency, authority, and

26  employment.  Each of the Defendants is responsible for the losses, damages and

27  harm suffered by Solomon alleged herein.

28  　　　　9.　　Solomon is informed and believes, and based thereon alleges, that

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Defendants conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each Defendant sued herein is jointly and severally responsible and liable to Solomon for the damages alleged herein.

10.    Solomon is informed and believes, and thereupon alleges, that Jacobson, and Does 1 through 12 (the "Non-Corporate Defendants") are, and at all times herein mentioned were, owners of and/or exercised control over all or a controlling portion of Lotto and Does 13 through 25 (the "Corporate Defendants") and that there existed between the Non-Corporate Defendants and Corporate Defendants a unity of interest and ownership, such that any individuality and separateness between the Non-Corporate Defendants and Corporate Defendants never existed or has ceased, and that the Corporate Defendants are the alter ego of the Non-Corporate Defendants in that:

a.    The Corporate Defendants were conceived, intended, and/or used by the Non-Corporate Defendants, and each of them, as a device for the purpose of substituting a financially insolvent corporation in the place of the Non-Corporate Defendants to avoid individual liability;

b.    The Non-Corporate Defendants, and each of them, used the assets of the Corporate Defendants for their own purposes as though they were their own, and caused assets of the Corporate Defendants to be transferred to them, or to entities they controlled, or to their family members, without adequate consideration and/or to avoid creditors;

c.    The Non-Corporate Defendants, and each of them, dominated and controlled the finances of the Corporate Defendants, treated the corporate accounts as their personal bank accounts, and commingled corporate and personal funds for their personal use and to avoid creditors of the Corporate Defendants.

d.    The Non-Corporate Defendants, and each of them, completely disregarded the corporate formalities and separateness of the Corporate Defendants,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  in that the operations of the Corporate Defendants were carried out without the
2  holding of shareholders' or directors' meetings, records or minutes of any corporate
3  proceedings were not maintained, and transactions between and among the Non-
4  Corporate Defendants and the Corporate Defendants were neither approved by
5  directors nor shareholders, nor properly documented.

6         e.     Solomon is informed and believes, and based thereon alleges,
7  that adherence to the fiction of the separate existence of Corporate Defendants as an
8  entity distinct from the Non-Corporate Defendants, and each of them, would permit
9  an abuse of the corporate privilege and would sanction fraud.

10      11.    As a result of the foregoing, Solomon is informed and believes, and
11  based thereon alleges, that the Corporate Defendants are the alter ego of the Non-
12  Corporate Defendants and, therefore, Solomon may proceed against all Defendants
13  directly, as they each and all are liable for any and all damages suffered by
14  Solomon.

15  **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**
16  **Jacobson's Solicitation of Solomon and Her Investment in Lotto**

17      12.    On or about August 25, 2014, Solomon was introduced to Jacobson by
18  a mutual acquaintance.

19      13.    Between August 25 and August 28, 2014, Solomon and Jacobson
20  entered into negotiations regarding a vendor service contract between their two
21  respective companies, Solomon's LA Media Source and Jacobson's Lotto.

22      14.    By August 28, 2014, Solomon and Jacobson had agreed, on behalf of
23  their respective companies, to enter into such an agreement, and Solomon forwarded
24  a Social Media Service Contract Work for Hire (the "Service Agreement") for
25  Jacobson's consideration.  There was no mention whatsoever of a personal
26  investment by Solomon in Lotto as a condition of the Service Agreement at that
27  time.

28      15.    On August 29, 2014, Solomon and Jacobson met in person to finalize

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  the terms of the Service Agreement, and it was on this day that Jacobson made his

2  pitch to Solomon and solicited her to purchase shares in Lotto.

3       16.    Jacobson claimed that Lotto was a strong company with highly

4  qualified officers, wealthy investors, and an extremely lucrative future.

5       17.    At first, Solomon believed these statements were intended to assure her

6  that contracting with Lotto was safe and mutually beneficial, but as the meeting

7  continued, Jacobson's intention became clear: he wanted Solomon to invest in Lotto

8  by purchasing some of his own shares.

9       18.    Prior to this, Jacobson made no indication that the Service Agreement

10  would be dependent upon a personal investment, or that he would be seeking an

11  investment from her in addition to the Service Agreement.

12       19.    Jacobson spun a tale that he "just happened" to have 180 shares

13  available for purchase because a Lotto employee was supposed to purchase them as

14  part of an options agreement, "but canceled."  Then, another shareholder desperately

15  wanted the shares but "could not get the funding from his family."  Jacobson

16  asserted that it was fortuitous that he "just happened" to have these shares, and they

17  would be perfect for Solomon.

18       20.    As part of his efforts to induce Solomon to purchase shares in Lotto,

19  Jacobson, on behalf of Lotto, made the following oral representations to her:

20          a.    Jacobson had contracts finalized with every large grocery store

21  and gas station chain, which were bringing in close to $1 million per month;

22          b.    Jacobson had received several offers to purchase Lotto;

23          c.    Lotto would be sold in one year for $100 million and Solomon

24  would make at least $900,000 from her investment; and

25          d.    Lotto's controlling investor would not permit Lotto to have any

26  more investors or issue any more shares, but because Solomon would be handling

27  social media for the company, Solomon would be able to purchase the shares

28  Jacobson was offering since it was such a small amount.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

21.     Jacobson also sent Solomon a retail "deck" (*i.e.*, a PowerPoint-type presentation used to pitch Lotto's services to purchasers, not investors) and a summary of the "potential" value of Lotto.  Jacobson made the following representations to Solomon in order to induce her to invest in Lotto:

> We will allow you to buy up to $45k shares of stock at a $20m valuation which is a 80% discount our current negotiations to close with strategic investors; so you should realize a gain of approximately $225k in the immediate future and have tremendous upside going forward.

> The strategic partners/investors are in the big data business already and are 2 multi billion dollar companies who know how to extract every dollar out of our user data. Though we don't need their money a $7.5MM capital investment at a $100MM post money valuation is too good to turn down and it gives us the ability to engage in a massive business development and marketing campaign to create awareness and secure user base. If you give me a call I can go over the details of the strategic investors we're negotiating with and the status of our retailers.

> Per $100M in sales price of the company (taking into account only 1 strategic investor) you'd receive approximately $200k. $500M sales price $1MM and so on. So you have a healthy incentive to really hit things out of the park.

22.     Even though he was soliciting the sale of securities to Solomon, Jacobson failed to provide any of the required documentation regarding the investment in Lotto prior to soliciting Solomon, such as risk disclosures or a private placement memorandum ("PPM").

23.     Jacobson made no effort to determine Solomon's risk tolerance, net worth, investment objectives, investment acumen, or level of experience.  He also failed to make any effort to determine if Solomon was an "accredited investor," as required by applicable federal and state law.

24.     Jacobson, on behalf of Lotto, pressured Solomon to invest immediately, with no time to consider whether such an investment was suitable for her, or whether she understood the risks associated therewith.  Instead, Jacobson promised to extend the term of the Service Agreement from 90 days to 12 months if Solomon

1  purchased the shares immediately.

2      25.     In reliance on the promises and representations made by Jacobson,

3  Solomon purchased 180 shares of Lotto common stock from Jacobson for $45,000,

4  as evidenced by the Stock Purchase Agreement dated August 29, 2014, a true and

5  correct copy of which is attached hereto as Exhibit A.  Although he promised to

6  deliver a fully executed copy of the Stock Purchase Agreement  to Solomon,

7  Jacobson never did after Solomon had executed and returned it to him.

8      26.     On August 31, 2014, after the execution and "Effective Date" of the

9  Stock Purchase Agreement, Jacobson sent to Solomon purported "financials" and

10  "projections" for Lotto that were merely excel spreadsheets created by him without

11  any supporting documentation to show where the numbers came from or what they

12  meant.

13      27.     Jacobson purposely misrepresented Lotto to Solomon, and Jacobson

14  concealed certain material information about Lotto that would have impacted

15  Solomon's decision to invest in Lotto.  Lotto did not hold the prospect of success

16  that Jacobson claimed, as evidenced by, among other things, the low customer

17  ratings it received in the iTunes and Google App stores (a 1.7 rating out of a

18  potential 5.0).  Such ratings and other information demonstrate the falsity of

19  Jacobson's misrepresentation concerning Lotto's health and future prospects.

20      28.     Moreover, Solomon is informed and believes, and based thereon

21  alleges, that Jacobson did not have the right to sell any shares to Solomon without

22  prior consent and/or waiver from the other Lotto shareholders, thereby signing the

23  Stock Purchase Agreement under false pretenses.  The Stock Purchase Agreement

24  states in pertinent part:

25      3.      **REPRESENTATIONS AND WARRANTIES OF**
           **SELLER.**  Seller hereby represents and warrants to

26      Investor as follows:

27      (a)     Authorization.  Seller has full power and authority
           to enter into the Transaction Documents to which Seller is

28      a party and to carry out the transactions contemplated

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

hereby and thereby.  Each of the Transaction Documents to which Seller is a party constitutes a valid and binding obligation of Seller enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(c)    <u>Consents.</u>  Seller is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or any third party in connection with the execution, delivery and performance by Seller of any of the Transaction Documents to which Seller is a party.

(d)    <u>No Conflict.</u>  Neither the execution and delivery of any Transaction Document to which Seller is a party nor the consummation or performance by Seller of any of the transactions contemplated thereby will (i) violate any law, order, rule, or regulation applicable to Seller, (ii) result in the creation or imposition of any Lien upon any of the assets of the Company or the Shares or the Warrant, or (iii) breach any provision of, or give any person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any contract or agreement to which Seller is a party.

29.    As a preliminary matter, "Transaction Documents" is not a defined term in the Stock Purchase Agreement, and no other documents were provided to Solomon that reasonably could have been construed as part of the transaction contemplated by the Stock Purchase Agreement.

30.    In addition, Solomon is informed and believes, and based thereon alleges, that other shareholders of Lotto had the right of first refusal and/or other co-sale rights, and Jacobson failed to acquire consents and/or waivers from any of these shareholders prior to signing the Stock Purchase Agreement.

31.    Jacobson's conduct calls into question his true intent in soliciting $45,000 from Solomon as an investor (and undoubtedly other investors).

32.    Solomon is informed and believes, and based thereon alleges, that Jacobson was personally using Lotto funds and relying upon Lotto to act as a corporate front to avoid personal liability.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

33.     Although Jacobson was the seller pursuant to the Stock Purchase Agreement, he requested that the funds be wired to Lotto's bank account. Accordingly, Solomon made the wire transfer of $45,000 to Lotto's bank account on September 2, 2014.

34.     From September 2, 2014, to the present, Solomon has repeatedly asked for copies of the stock certificates and/or any other documents evidencing her purchase, but Jacobson has failed and refused to comply, consistently coming up with feeble excuses to justify his failure and, instead, filing a spurious arbitration claim with the American Arbitration Association ("AAA") against Solomon personally based on LA Media Source's purported breach of the Service Agreement with Lotto in an apparent attempt to deter Solomon from taking any action against him with respect to her investment in Lotto.

## The Service Agreement Dispute

35.     The Service Agreement required that Solomon provide media support for Lotto, by, among other things, regularly posting on social media sites such as Twitter and Facebook.

36.     Lotto paid LA Media Source timely and in full for September 2014. Therefore, in September, Solomon posted once a day, every day.  As a result, on behalf of LA Media Source, she spent $426.03 on advertisement, even though the Service Agreement only required a minimum expenditure of $300 per month.

37.     In October, advertisements had cost $660.06, more than the maximum of what was required under the Service Agreement, but Solomon was willing to spend the extra amount because she wished to ensure that Lotto had a solid media presence upon which to build in the future.

38.     On October 29, 2014, Solomon sent Jacobson LA Media Source's invoice for services to be rendered in November, giving Lotto three days to remit payment.

39.     On October 30, 2014, Jacobson began offering  the first in a continuing

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  stream of feeble excuses for failing to pay the November invoice on time.  First, it

2  was a problem with "lawyers and investors."  On November 1, he announced that he

3  was switching banks and would not be able to pay on behalf of Lotto "for a few

4  days."  On November 4, Jacobson assured Solomon that the new bank account

5  would be available, again, "in a couple of days."  On November 10, Solomon sent

6  Jacobson a text requesting the status of the November 1 payment; he failed to

7  respond until November 12, when he claimed he would wire funds to Solomon in

8  two days.  On November 14, Jacobson affirmatively stated he had sent the wire

9  transfer, but by November 17, Solomon still had not received the payment for the

10  November invoice.

11       40.  Timely payment was a material term of the Service Agreement.  The

12  Service Agreement states in pertinent part:

13         In the event that [Lotto] fails to pay [LA Media Source] by
       5:00 p.m. (CST) on the 1st business day of the month, [LA

14         Media Source] will cease to provide services until
       payment is received…. Should suspension of services

15         occur, the complete payment will be necessary to resume
       services – a prorated amount will not be provided.

16

17       41.  Solomon had every right to cease all services until the November

18  payment was received in full.  Believing that Jacobson was actually experiencing

19  difficulty with his bank as represented, she made certain social media posts during

20  November, despite the fact that she did not have any obligation to do so pursuant to

21  the terms of the Service Agreement.

22       42.  On November 19, 2014, Jacobson sent Solomon a text, claiming that

23  the bank was requesting additional forms "so there isnt [sic] a mistake."  A few

24  hours later, he claimed he had wired the funds – again.  On November 20, Jacobson

25  asserted that the bank had finally sent a wire transfer, but that it was for the "wrong

26  amount."  It was not until November 22 that full payment was finally received by

27  Solomon.

28       43.  Due to these ongoing payment issues, in December 2014, it was agreed

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

between the parties that payments for advertisement with Facebook would be paid via a credit card that was owned by Jacobson and/or Lotto.  However, on December 22, 2014, Facebook informed Solomon that the credit card had been declined and it ceased the campaign.

44.     True to form, Jacobson declared that there was a "glitch hold" on the card and that he had been dealing with the issue throughout the day (although he failed to inform Solomon of this problem before she brought it to his attention).

45.     The December invoice from Facebook totaled $773.08, and because LA Media Source was the contracting entity, Facebook held LA Media Source responsible for the invoice.  Leaving an open invoice with Facebook made it impossible for LA Media Source to perform under the terms of the Service Agreement with regard to Facebook.

46.     Jacobson interfered with LA Media Source's ability to perform under the Service Agreement on other occasions as well, such as, among other things, explicitly demanding that Solomon not "do any outreach [regarding his attendance at the National Association of Convenience Stores conference, because] we are going to do stuff we're not allowed to and I don't want them alerted."

47.     Jacobson also demanded that Solomon postpone an advertisement campaign targeting multiple states that she was ready to launch, because, apparently, the product was not available in every state, despite Jacobson's prior assertions to the contrary.

48.     On December 29, 2014, LA Media Source sent its invoice for January 2015 to Jacobson.  On January 7, Solomon inquired about the late payment, as well as on January 9, January 13, January 14, and finally on January 15, when Jacobson provided her with a check in person.  The following day, Solomon was told by Jacobson's bank that the check was "non-negotiable" and that she must address the issue with Jacobson directly.  Solomon sent him a text message: "I went to deposit the check and they said its [sic] going to bounce.  Is there no money in Lottolotto?"

1  Jacobson again claimed that it was due to the bank's error.  On January 20, Solomon

2  made another effort to deposit the check and again was told that it was "non-

3  negotiable."

4      49.    It became clear that Jacobson and Lotto were unable remit full payment

5  or otherwise perform pursuant to the terms of the Service Agreement.

6      50.    On January 21, 2015, Jacobson sent a surly email to Solomon, making

7  various accusations and, upon information and belief, knowingly false statements

8  concerning Solomon's performance under the Service Agreement.

9      51.    Whether Lotto had sufficient funds to cover the January 2015 check for

10  $4,500 is still unknown by Solomon.  Having the check deemed "non-negotiable"

11  not once, but twice by Jacobson's own bank casted serious doubt as to the viability

12  of Lotto and the status of Solomon's $45,000 investment.

13  **Solomon's Demands for Inspection and for Return of Her Investment**

14      52.    On January 24, 2015, Solomon made a formal demand to inspect

15  certain Lotto corporate records pursuant to her rights as a Lotto shareholder.

16      53.    In Jacobson's initial response on January 29, 2015, he agreed to

17  provide the documents but tried to stall for additional time, claiming that it would

18  take "more than 5 days to compile."  His email stated in pertinent part:

19      …. Your list was forwarded to the company counsel and
20      simply stated it requires more than 5 days to compile. …
        Ordinarily I would simply furnish you with much of what
21      you are requesting and I have direct access to myself,
        however your threats and demands directly and indirectly
22      through your father have escalated matters so that
        everything must be done by counsel.

23      The company is happy to comply with all rules and
24      regulations for shareholders however this list makes
        requests for documents already in your possession, items
25      that don't exist or aren't applicable to the company and or
        as a shareholder you are not entitled to. The very nature of
26      asking for such a broad list of items requires a legal
        response to each point and cannot be completed in the
27      allotted time.

        The company is working with counsel and you will
28      receive the items you are entitled to and legal responses to

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

those who you are not by 6pm PST February 13th, 2015.

54.   Solomon is informed and believes, and based thereon alleges, that Jacobson did not have the authority to deny Solomon's request, and his refusal to provide corporate documents was in direct contravention of law.

55.   In addition, Jacobson claimed that the list was forwarded to "company counsel," that Solomon's demand required a legal response, and that the company was working with counsel to provide a response.  As such, Lotto's counsel was put on notice that there was a demand, and Lotto was obligated, under the law, to provide a reasonable response.

56.   Instead, Jacobson chose to respond by falsely claiming that Solomon had these documents in her possession (which he knew was false), that they did not exist (which would be in contravention of applicable federal and state corporate laws), that they did not apply to Lotto (which, again, would be in contravention of applicable federal and state law), and that she was not entitled to such documentation (which, as an officer of Lotto, he knew, or should have known, was false).

57.   Later the same day, Jacobson attempted to recant his agreement to provide the required documents.  This was purportedly based upon a conversation he had with "company counsel" that advised him that he need not provide the documents unless Solomon re-submit her request in conformity with Delaware Code § 220, presumably because Lotto is a Delaware corporation.

58.   Lotto's "company counsel" knew or should have known that it is irrelevant whether Lotto was incorporated in Delaware because the Company has made itself subject to California law with regard to the Stock Purchase Agreement based on the following:

a.   The Stock Purchase Agreement specifically states that "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of California.  By signing this Agreement, the Parties hereby agree and submit

ading

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  to the jurisdiction of the courts in California, and that venue of any suit or action

2  shall be in state or federal courts located in Los Angeles County, California."  Stock

3  Purchase Agreement, ¶ 4(g), p. 4;

4         b.     California Corporations Code § 1600(d), which governs a

5  stockholder's right to corporate records, states in pertinent part that "[section 1600,

6  *et seq.*] applies to any domestic corporation and to any foreign corporation having

7  its principal executive office in this state or customarily holding meetings of its

8  board in this state."  Lotto's principal executive office is, and has always been, in

9  California, and, assuming the company holds board meetings at all, such meetings

10  are likely to be held in California; and

11         c.     California's public policy in favor of protecting its citizen's

12  rights and interests would dictate that California law applied: the investment was

13  solicited in California, the Stock Purchase Agreement was entered into in California,

14  and the funds were transferred to and from California bank accounts.

15       59.    Solomon's demand for inspection met the requirements for a demand

16  under California law, as the demand was made in writing and the documents

17  requested were reasonably related to Solomon's interests as a Lotto shareholder.

18       60.    More specifically, the documents requested by Solomon were

19  necessary to determine, among other things, the validity of her investment, the value

20  of Lotto's underlying assets generally, the value of Solomon's investment

21  specifically, and Lotto's ability to adequately compensate Solomon for her shares.

22  There is no immediate market for Solomon's shares, and therefore this necessitates

23  the valuation of Lotto based upon the corporation's accounting books and records.

24       61.    Moreover, pursuant to California law, Lotto was obligated to comply

25  with a demand for inspection within five business days of receipt of the demand.

26       62.    If "company counsel" actually advised its client to refuse to provide

27  statutorily required documentation to a shareholder, such counsel should have been

28  the one to respond to Solomon's request, rather than Jacobson, and should have

1  provided substantial evidence that the request could be properly denied.

2  63.   As established above, this behavior follows a pattern that Jacobson, on
3  Lotto's behalf, has engaged in with Solomon repeatedly by asserting that a
4  particular matter had been or will be taken care of, then stall for time, offer excuses
5  why nothing was done, and then finally recant and deny Solomon that to which she
6  was rightfully entitled.

7  64.   On February 12, 2015, Solomon's counsel sent a demand letter to
8  Defendants' counsel setting forth, in great detail, the factual and legal bases for
9  Solomon's potential claims against Defendants, and again demanding, amongst
10  other things, an inspection of Lotto's corporate records, and the return of Solomon's
11  $45,000 investment in Lotto.

12  65.   On February 13, 2015, Defendants' counsel sent a letter to Solomon's
13  counsel.  Tellingly, counsel did not respond to the threatened securities fraud and
14  related tort and breach of contract claims and instead reiterated the purported basis
15  for Defendants' manufactured AAA arbitration claim.  None of the requested
16  documents were ever provided or made available for inspection.

17  66.   Solomon has attempted to resolve these disputes with Defendants
18  without having to resort to litigation, but to no avail.

19  **<u>FIRST CLAIM FOR RELIEF</u>**

20  **(Securities Fraud – Violation of SEC Rule 10(b) – Against All Defendants)**

21  67.   Solomon incorporates by reference each and every allegation contained
22  in Paragraphs 1 through 66 as though fully set forth herein.

23  68.   On behalf of Lotto, Jacobson solicited, recommended, and sold
24  securities to Solomon (and others) and made material misrepresentations and
25  omissions regarding Lotto's financial condition, future prospects, and ownership
26  interests.

27  69.   Moreover, Jacobson knowingly and purposely misled Solomon
28  regarding the correlation between the investment in Lotto and the Service

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Agreement with LA Media Source.

2      70.    Solomon is informed and believes, and based thereon alleges, that

3  Jacobson knew that Solomon had minimum expectations before she would consider

4  an investment in Lotto.

5      71.    Jacobson knew or should have known that such an investment was

6  unsuitable for Solomon, and that the Service Agreement was a separate agreement

7  that was not, or should not have been, correlated to the investment at issue, as

8  entering into a service contract cannot establish that Solomon was a sophisticated

9  investor, or an "accredited investor," or that a particular investment is suitable.

10      72.    Jacobson failed to make any effort to determine Solomon's investment

11  risk tolerance, net worth, investment objectives, or investment acumen and

12  experience.

13      73.    Jacobson knowingly and/or recklessly made false representations and

14  omissions to Solomon – an unsophisticated investor who was not "accredited" –

15  related to the suitability of the investment in order to induce Solomon to invest in

16  Lotto anyway.

17      74.    Solomon justifiably relied upon Jacobson's material misrepresentations

18  and omissions to her detriment in that she agreed to invest $45,000 in Lotto, but she

19  was never provided with the share certificates or any other documentation

20  evidencing her investment despite her repeated requests for same.

21      75.    Solomon would not have invested in Lotto had she known the truth

22  about its financial condition or if she had been provided with the requisite risk

23  disclosures and a PPM.  Nor would she have invested in Lotto if she knew that

24  Defendants were simply going to take her money without issuing her the shares she

25  contracted for.

26      76.    As a direct and proximate result of Defendants' misconduct as alleged

27  herein, Solomon suffered, and continues to suffer, damages in an amount according

28  to proof but not less than $45,000.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

77.     In committing the acts alleged herein, Defendants, and each of them, are personally and individually guilty of oppression, malice, fraud, and despicable conduct directed to Solomon in conscious disregard of her legal rights.  The acts alleged herein were known to, authorized, and ratified by Defendants.  Solomon is thus entitled to recover punitive damages from Defendants in an amount to be determined at trial that is appropriate to punish Defendants and deter them from future misconduct.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against All Defendants)

78.     Solomon incorporates by reference each and every allegation contained in Paragraphs 1 through 77 as though fully set forth herein.

79.     A fiduciary relationship arose between Solomon, an unsophisticated investor, and the Defendants, and each of them, when Solomon reposed a confidence in the integrity of the Defendants and they voluntarily accepted that confidence.

80.     Defendants thus had a duty to act in Solomon's best interest and not take advantage of her.

81.     Defendants solicited and maintained a fiduciary relationship with Solomon and were in control of the substantial assets she provided, namely the $45,000 she was induced to surrender to Jacobson and/or Lotto.

82.     Based on that duty, Defendants had a duty to disclose all relevant information concerning the investment in Lotto in a forthright and timely manner, particularly information that may have an adverse impact on Solomon.

83.     By Defendants' wrongful acts and omissions described herein, they placed their own financial interests over the best interests of Solomon.

84.     Solomon reasonably relied upon Defendants' representations that they would act in her best interest, and Defendants intended to induce Solomon to so rely.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

85.    Defendants breached their fiduciary duty by inducing Solomon to surrender $45,000 to Jacobson and/or Lotto before giving her any information whatsoever regarding the investment, including risk disclosures or a PPM.

86.    As a result of Defendants' breach of their fiduciary duties owed to Solomon, Solomon suffered, and continues to suffer, damages in an amount according to proof but not less than $45,000.

87.    In committing the acts alleged herein, Defendants, and each of them, are personally and individually guilty of oppression, malice, fraud, and despicable conduct directed to Solomon in conscious disregard of her legal rights.  The acts alleged herein were known to, authorized, and ratified by Defendants.  Solomon is thus entitled to recover punitive damages from Defendants in an amount to be determined at trial that is appropriate to punish Defendants and deter them from future misconduct.

### THIRD CLAIM FOR RELIEF

### (Fraud – Against All Defendants)

88.    Solomon incorporates by reference each and every allegation contained in Paragraphs 1 through 87 as though fully set forth herein.

89.    On behalf of Lotto, Jacobson solicited the sale of Lotto shares to Solomon and made material misrepresentations and omissions to Solomon regarding Lotto's financial condition, future prospects, and ownership interests as described herein.

90.    At the time that Defendants, and each of them, intentionally concealed and suppressed these material facts, Solomon was ignorant of the existence of the true facts.

91.    The misrepresentations and omissions by Defendants, including the failure to provide Solomon with the requisite risk disclosures and a PPM, evidence a clear intent to deceive and/or defraud Solomon.

92.    Solomon reasonably relied on Defendants' misrepresentations and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   omissions, and based thereon, agreed to invest $45,000 in Lotto.

2        93.   Solomon would not have entered into the Stock Purchase Agreement
3   and invested in Lotto had she known the truth of Lotto's financial condition, or if
4   she had been provided with the requisite risk disclosures or a PPM.

5        94.   As a direct and proximate result of Defendants' misconduct as alleged
6   herein, Solomon suffered, and continues to suffer, damages in an amount according
7   to proof but not less than $45,000.

8        95.   In committing the acts alleged herein, Defendants, and each of them,
9   are personally and individually guilty of oppression, malice, fraud, and despicable
10  conduct directed to Solomon in conscious disregard of her legal rights.  The acts
11  alleged herein were known to, authorized, and ratified by Defendants.  Solomon is
12  thus entitled to recover punitive damages from Defendants in an amount to be
13  determined at trial that is appropriate to punish Defendants and deter them from
14  future misconduct.

## FOURTH CLAIM FOR RELIEF

### (Constructive Fraud)

17       96.   Solomon incorporates by reference each and every allegation contained
18  in Paragraphs 1 through 95 as though fully set forth herein.

19       97.   As a result of the breaches of their fiduciary duties owed to Solomon
20  and their misrepresentations and omissions described herein, Defendants, and each
21  of them, have been unjustly enriched in that they have converted for their own
22  personal benefit and gain the monies invested by Solomon in Lotto.

23       98.   Even in the absence of actual fraudulent intent, Defendants are liable to
24  Solomon under the theory of constructive fraud.

25       99.   As a direct and proximate result of Defendants' misconduct as alleged
26  herein, Solomon suffered, and continues to suffer, damages in an amount according
27  to proof but not less than $45,000.

28       100.  In committing the acts alleged herein, Defendants, and each of them,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  are personally and individually guilty of oppression, malice, fraud, and despicable

2  conduct directed to Solomon in conscious disregard of her legal rights.  The acts

3  alleged herein were known to, authorized, and ratified by Defendants.  Solomon is

4  thus entitled to recover punitive damages from Defendants in an amount to be

5  determined at trial that is appropriate to punish Defendants and deter them from

6  future misconduct.

**FIFTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation – Against All Defendants)**

9      101.   Solomon incorporates by reference each and every allegation contained

10  in Paragraphs 1 through 100 as though fully set forth herein.

11      102.   At the time of inducing Solomon to invest in Lotto and enter into the

12  Stock Purchase Agreement, Jacobson, on Lotto's behalf, represented that Lotto was

13  a viable, solvent business with strong growth prospects.

14      103.   These representations were false at the time they were made to

15  Solomon, and Defendants had no reasonable grounds for believing they were true.

16      104.   Defendants, and each of them, made these false representations to

17  Solomon with the intent that Solomon would rely on them, and Solomon, not

18  knowing these representations were false, did in fact reasonably rely on them.

19      105.   In reasonable reliance on these misrepresentations, Solomon was

20  induced to and did enter into the Stock Purchase Agreement and made the $45,000

21  investment in Lotto.

22      106.   Solomon was ignorant of the fact that Defendants' representations were

23  false, and she could not, in the exercise of reasonable diligence, have discovered

24  they were false prior to entering into the Stock Purchase Agreement.

25      107.   Solomon's reliance on these false representations was a substantial

26  factor in causing her harm.

27      108.   As a direct and proximate result of Defendants' misconduct as alleged

28  herein, Solomon suffered, and continues to suffer, damages in an amount according

1   to proof but not less than $45,000.

2   ## SIXTH CLAIM FOR RELIEF

3   ### (Rescission – Against Jacobson)

4   109.   Solomon incorporates by reference each and every allegation contained

5   in Paragraphs 1 through 108 as though fully set forth herein.

6   110.   Defendants, and each of them, made written and oral

7   misrepresentations and omissions regarding Lotto's financial condition, future

8   prospects, and ownership interests in connection with Jacobson's sale of Lotto

9   shares to Solomon.

10   111.   Defendants' represented to Solomon untrue statements of material facts

11   and omitted to state material facts necessary to make the representations made not

12   misleading.

13   112.   Solomon's consent to enter into the Stock Purchase Agreement was

14   obtained by fraud and/or undue influence exerted by Defendants upon Solomon.

15   113.   As a result of the fraud and undue influence, Solomon is entitled to

16   rescission of the Stock Purchase Agreement and the return of her investment of

17   $45,000.  Defendants failed to provide any stock certificates to Solomon evidencing

18   her investment in Lotto, therefore, there is nothing for Solomon to return to

19   Defendants.

20   ## SEVENTH CLAIM FOR RELIEF

21   ### (Breach of Written Contract – Against Jacobson)

22   114.   Solomon incorporates by reference each and every allegation contained

23   in Paragraphs 1 through 113 as though fully set forth herein.

24   115.   Solomon and Jacobson entered into the Stock Purchase Agreement,

25   which provided that Solomon was investing $45,000 with the Defendants in

26   exchange for 180 shares of Lotto common stock.

27   116.   Solomon has performed all acts, conditions, covenants, promises, and

28   other obligations required to be performed by her pursuant to the terms of the Stock

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Purchase Agreement, except those that were prevented and/or excused by

2  Defendants' conduct or by operation of law.

3      117.   Jacobson has breached the Stock Purchase Agreement by failing and

4  refusing, and continuing to fail and refuse, to abide by the terms of the Stock

5  Purchase Agreement, including, but not limited to, failing to deliver the 180 shares

6  of Lotto common stock to Solomon.

7      118.   Solomon would not have entered into the Stock Purchase Agreement

8  with Jacobson had she known that Jacobson would not fulfill his duties and

9  obligations thereunder.

10     119.   As a direct and proximate result of Jacobson's breach as alleged herein,

11 Solomon suffered, and continues to suffer, damages in an amount according to proof

12 but not less than $45,000.

13                    **EIGHTH CLAIM FOR RELIEF**

14        **(Breach of Implied Covenant of Good Faith and Fair Dealing –**

15                         **Against Jacobson)**

16     120.   Solomon incorporates by reference each and every allegation contained

17 in Paragraphs 1 through 119 as though fully set forth herein.

18     121.   Implied in the Stock Purchase Agreement is the covenant of good faith

19 and fair dealing.  This covenant obligated Jacobson to act in good faith toward

20 Solomon and required Jacobson not to take any action to prevent Solomon from

21 receiving the full benefits of the Stock Purchase Agreement, including, but not

22 limited to, the 180 shares of Lotto common stock.

23     122.   By acting and/or omitting to act as alleged herein, Jacobson

24 unreasonably and arbitrarily hindered and damaged Solomon and her reasonable

25 expectations under the Stock Purchase Agreement.

26     123.   Jacobson's actions as described herein constitute a breach of the

27 implied covenant of good faith and fair dealing.

28     124.   As a direct and proximate result of Jacobson's breach as alleged herein,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Solomon suffered, and continues to suffer, damages in an amount according to proof but not less than $45,000.

## NINTH CLAIM FOR RELIEF

### (Conversion)

125.    Solomon incorporates by reference each and every allegation contained in Paragraphs 1 through 124 as though fully set forth herein.

126.    In reliance on the misrepresentations and omissions by Defendants, and each of them, described herein, Solomon invested $45,000 in Lotto by wiring said funds to Jacobson via Lotto's bank account on September 2, 2014.

127.    Defendants wrongfully exercised control over Solomon's monies and converted same for their own personal benefit and gain.

128.    Solomon has demanded return of her monies, but Defendants have failed and refused those demands and they continue to assert sole and exclusive possession and control over the monies that belong to Solomon.

129.    As a direct and proximate result of Defendants' conversion, Solomon suffered, and continues to suffer, damages in an amount according to proof but not less than $45,000.

130.    Because the value of the monies converted by Defendants may have grown far greater than the legal rate of interest recognizes, and allowing Defendants to pocket the difference would reward them for their wrongdoing, Solomon is entitled to a constructive trust on the monies converted by Defendants and any product and profit derived therefrom.

131.    In committing the acts alleged herein, Defendants, and each of them, are personally and individually guilty of oppression, malice, fraud, and despicable conduct directed to Solomon in conscious disregard of her legal rights.  The acts alleged herein were known to, authorized, and ratified by Defendants.  Solomon is thus entitled to recover punitive damages from Defendants in an amount to be determined at trial that is appropriate to punish Defendants and deter them from

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 | future misconduct.

**TENTH CLAIM FOR RELIEF**

**(Unjust Enrichment – Against All Defendants)**

132.  Solomon incorporates by reference each and every allegation contained in Paragraphs 1 through 131 as though fully set forth herein.

133.  Solomon entered into the Stock Purchase Agreement for valuable consideration, namely a $45,000 investment in Lotto.

134.  By failing to abide by the Stock Purchase Agreement, and continuing to use such monies for their own use and benefit without Solomon's authorization or consent, Defendants, and each of them, have been unjustly enriched.

135.  Defendants have wrongfully deprived Solomon of the benefit of her monies by virtue of Defendants' misrepresentations and omissions and failure to abide by the terms of the Stock Purchase Agreement.

136.  As a direct and proximate result of Defendants' misconduct as alleged herein, Solomon suffered, and continues to suffer, damages in an amount according to proof but not less than $45,000.

137.  Defendants are required to make restitution in an amount of at least $45,000 to Solomon for their misconduct, and further, to hold all such monies and the product and profit derived therefrom in constructive trust on Solomon's behalf.

**ELEVENTH CLAIM FOR RELIEF**

**(Accounting – Against All Defendants)**

138.  Solomon incorporates by reference each and every allegation contained in Paragraphs 1 through 137 as though fully set forth herein.

139.  As a direct and proximate result of Defendants' misconduct and breaches as alleged herein, Defendants have received and are in possession of monies that rightfully belong to Solomon, which includes, but is not limited to, Solomon's $45,000 investment in Lotto.

140.  Defendants are in control of the books and records of Lotto and have

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 refused and continue to refuse Solomon any access to them.

2 141. The facts of Lotto's financial condition, future prospects, and

3 ownership interests are peculiarly within the knowledge of Defendants, and

4 Solomon has no independent means of determining them completely without a full

5 accounting.

6 142. A specific accounting is necessary so that the amount due to Solomon

7 may be ascertained.

8 143. Additionally, in order to properly determine Solomon's legal and

9 equitable remedies under the claims for relief set forth herein, Solomon is entitled

10 to, and hereby requests, an accounting of any and all other information necessary to

11 determine the proper accounting of all damages suffered by Solomon as a result of

12 Defendants' misconduct and breaches described in.

13 ## **PRAYER FOR RELIEF**

14 WHEREFORE, Solomon prays for judgment against Defendants, and each of

15 them, as follows:

16 ### **On the First Claim for Relief for Securities Fraud**

17 1. For general and consequential damages of not less than $45,000

18 according to proof at the time trial;

19 2. For exemplary and punitive damages in an amount according to proof

20 at the time of trial;

21 ### **On the Second Claim for Relief for Breach of Fiduciary Duty**

22 3. For general and consequential damages of not less than $45,000

23 according to proof at the time trial;

24 4. For exemplary and punitive damages in an amount according to proof

25 at the time of trial;

26 ### **On the Third Claim for Relief for Fraud**

27 5. For general and consequential damages of not less than $45,000

28 according to proof at the time trial;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

6.     For exemplary and punitive damages in an amount according to proof at the time of trial;

### On the Fourth Claim for Relief for Constructive Fraud

7.     For compensatory and consequential damages of not less than $45,000 according to proof at the time of trial;

8.     For exemplary and punitive damages in an amount according to proof at the time of trial;

### On the Fifth Claim for Relief for Negligent Misrepresentation

9.     For compensatory and consequential damages of not less than $45,000 according to proof at the time of trial;

### On the Sixth Claim for Relief for Rescission

10.     For an order declaring the Stock Purchase Agreement rescinded and all obligations thereunder or arising therefrom null and void;

11.     For an order awarding the disgorgement of $45,000 from Defendants in favor of Solomon;

### On the Seventh Claim for Relief for Breach of Written Contract

12.     For compensatory and consequential damages of not less than $45,000 according to proof at the time of trial;

### On the Eighth Claim for Relief for Breach of Implied Covenant of Good Faith and Fair Dealing

13.     For compensatory and consequential damages of not less than $45,000 according to proof at the time of trial;

### On the Ninth Claim for Relief for Conversion

14.     For compensatory and consequential damages of not less than $45,000 according to proof at the time of trial;

15.     For a constructive trust on the funds converted and any product and profit derived therefrom;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2506155.3 25052-200

26

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1     16.    For exemplary and punitive damages in an amount according to proof

2 at the time of trial;

3            **On the Tenth Claim for Relief for Unjust Enrichment**

4     17.    For restitution to Plaintiff of any and all sums unlawfully collected by

5 Defendants;

6            **On the Eleventh Claim for Relief for Accounting**

7     18.    For an accounting;

8     19.    For payment to Solomon of the amount determined to be due from

9 Defendants as a result of such accounting and interest thereon at the legal rate;

10     20.    For the imposition of a constructive trust against Defendants for all

11 sums found due and owing to Solomon pursuant to such accounting;

12     21.    For the appointment of a receiver to take possession of the constructive

13 trust, and all books, reports, and records pertaining to the amounts owed to Solomon

14 by Defendants;

15               **On All Claims for Relief**

16     22.    For attorneys' fees and costs as allowed by law;

17     23.    For costs of suit incurred herein;

18     24.    For prejudgment and post-judgment interest at the legal rate as allowed

19 by law; and

20     25.    For such other and further relief as the Court may deem just and proper.

21

22 DATED: February 27, 2015        FREEMAN, FREEMAN & SMILEY, LLP

23

24

25         By:     */s/ Steven E. Young*

26             STEVEN E. YOUNG

            JOHN D. VAN ACKEREN

27             Attorneys for Plaintiff CORINNE

28             SOLOMON

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff Corinne Solomon hereby demands trial by jury.

3

4    DATED: February 27, 2015          FREEMAN, FREEMAN & SMILEY, LLP

5

6

7                                      By:     */s/ Steven E. Young*
                                              STEVEN E. YOUNG
8                                             JOHN D. VAN ACKEREN
                                              Attorneys for Plaintiff CORINNE
9                                             SOLOMON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2506155.3 25052-200

COMPLAINT

# EXHIBIT A

# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is dated as of August 29th, 2014 (the "Effective Date"), by and Brett Jacobson, an individual ("Seller"), and Corinne Solomon an individual ("Investor"). Each party to this Agreement is referred to herein as a "Party," and they are referred to collectively as "Parties."

1.     **PURCHASE AND SALE OF SHARES**

(a)     Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, as of the Effective Date, Seller hereby sells to the Investor, and the Investor hereby purchases from Seller, 180 shares of Common Stock, par value $0.01 per share, of Lotto Lotto Gamz Etc, Inc. (the "Shares"), in exchange for cash in the amount of $45,000 (the "Purchase Price"). Investor shall pay the Purchase Price to Seller by wire transfer of immediately available funds to an account designated by Seller upon execution of this Agreement.

2.     **REPRESENTATIONS AND WARRANTIES OF INVESTOR.**  Investor hereby represents and warrants to Seller as follows:

(a)     <u>Authorization</u>.  Investor has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.  This Agreement constitutes a valid and binding obligation of Investor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     <u>Own Account</u>.  Investor is acquiring the Shares as principal for his own account and not with a view to or for distributing or reselling the Shares or any part thereof in violation of the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities law, has no present intention of distributing any of the Shares in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of the Shares in violation of the Securities Act or any applicable state securities law.

(c)     <u>General Solicitation</u>.  Investor is not purchasing the Shares as a result of any advertisement, article, notice, or other communication regarding the Shares published in any newspaper, magazine, or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(d)     <u>Economic Risk</u>.  Investor understands that Company is privately held and there is no market for the Shares to be sold or otherwise traded.  Investor recognizes that an investment in the Shares involves a high degree of risk, and no assurance or guarantee has or can be given that an investor in Company will receive a return of his capital or realize a profit on his investment.

(e)      <u>Public Registration</u>.  Investor understands that the Shares have not been, and Investor has no rights to require that they be, registered or qualified under the Securities Act; that there is not now any public market for the Shares and none is anticipated; that the Shares will not be readily accepted as collateral for a loan; and that it may be extremely difficult to sell the Shares in the event of a financial emergency.  As a consequence, Investor understands that he must bear the economic risks of the investment in the Shares for an indefinite period of time.

(f)      <u>Accredited Investor</u>.  Investor represents that he is an "accredited investor" as defined under Regulation D promulgated under the Securities Act.

(g)      <u>Pre-Existing Relationship</u>.  Investor further warrants and represents that Investor has either (i) pre-existing personal or business relationships with Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his own interests in connection with the purchase of the Shares by virtue of the business or financial expertise of himself or of professional advisors to Investor who are unaffiliated with and who are not compensated by Company or any of its affiliates, directly or indirectly.

(h)      <u>Access to Documents and Information</u>.  Investor has (i) received and reviewed all information that he considers necessary or appropriate for deciding whether to purchase the Shares; (ii) had an opportunity, with his professional advisor, if any, to ask questions and receive answers from Company regarding this Agreement and regarding the business, financial condition, and other aspects of Company, and all such questions have been answered to Investor's full satisfaction; and (iii) had the opportunity to obtain all information (to the extent that Company possesses or can acquire such information without unreasonable effort or expense) that Investor deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to Investor.

(i)      <u>Investor's Advisors; No Reliance</u>.  Investor has relied completely on the advice of, or has consulted with or has had the opportunity to consult with, his own personal tax, investment, legal or other advisors relating to the purchase of the Shares and has not relied on Company (or any of Company's respective affiliates, officers, directors, attorneys, accountants, representatives, agents, advisors) for any such advice.  Investor has not relied on any information or representations with respect to Company or the Shares, other than as expressly set forth herein.

3.      **REPRESENTATIONS AND WARRANTIES OF SELLER**.  Seller hereby represents and warrants to Investor as follows:

(a)      <u>Authorization</u>.  Seller has full power and authority to enter into the Transaction Documents to which Seller is a party and to carry out the transactions contemplated hereby and thereby.  Each of the Transaction Documents to which Seller is a party constitutes a valid and binding obligation of Seller enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. [BJ: before you can make this representation you need the written consent/waiver of each party to the Shareholder Agreement with respect to the right of first refusal and co-sale right.]

(b)     <u>Title</u>.  Seller has good and marketable title to the Shares free and clear of any Liens.

(c)     <u>Consents</u>.  Seller is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or any third party in connection with the execution, delivery and performance by Seller of any of the Transaction Documents to which Seller is a party.

(d)     <u>No Conflict</u>.  Neither the execution and delivery of any Transaction Document to which Seller is a party nor the consummation or performance by Seller of any of the transactions contemplated thereby will (i) violate any law, order, rule, or regulation applicable to Seller, (ii) result in the creation or imposition of any Lien upon any of the assets of the Company or the Shares or the Warrant, or (iii) breach any provision of, or give any person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any contract or agreement to which Seller is a party.

4.     **GENERAL PROVISIONS**

(a)     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties concerning the matters referred to in this Agreement and therein and supersede all prior agreements and understandings, oral or written, with respect to matters referred to in this Agreement.

(b)     <u>Amendment and Waiver</u>.  No provision of this Agreement may be modified, supplemented, or amended except in a written instrument signed by Investor and Seller.  No waiver of any provision hereof shall be effective unless made in writing by the waiving party.

(c)     <u>Further Assurances</u>. The Parties hereto will, upon reasonable request, execute, and deliver all such further assignments, endorsements, agreements, and documents, and take such other action as may be necessary in order to consummate or evidence the transactions contemplated hereby.

(d)     <u>Notice</u>.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via email at the email address set forth on the signature page prior to 5:30 p.m. (Pacific Standard Time) on a business day, (b) the next business day after the date of transmission, if such notice or communication is delivered via email at the email address set forth on the signature page on a day that is not a business day or later than 5:30 p.m. (Pacific Standard Time) on any business day, (c) the first business day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the Party to whom such notice is required to be given.  The address for such notices and communications are as set forth on the signature page hereto.

(e)     <u>Successors and Assigns</u>.  This Agreement shall be binding upon, enforceable against, and inure to the benefit of, the Parties hereto and their respective heirs, administrators,

executors, personal representatives, successors, and assigns, and nothing herein is intended to confer any right, remedy, or benefit upon any other person.

(f)  <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.  By signing this Agreement, the Parties hereby agree and submit to the jurisdiction of the courts in California, and that venue of any suit or action shall be in state or federal courts located in Los Angeles County, California.

(h)  <u>Counterparts</u>.  This Agreement may be executed in counterparts and each counterpart shall have the same force and effect as an original and constitute an effective, binding agreement on the part of each of the undersigned.  A pdf or original signature shall constitute an original signature.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Stock Purchase Agreement as of the date first above written.

Corinne Solomon

_____

Address for Notices:

_____

_____

Email:

Lotto Lotto Gamz Etc, Inc.

By:_____

       Brett Jacobson,
       Chief Executive Officer

Address for Notices:
2200 Laurel Canyon Blvd
Los Angeles, CA 90046
Attention: Brett Jacobson
Email:brett@mylottolotto.com

_____
       Brett Jacobson

Address for Notices:
2200 Laurel Canyon Blvd
Los Angeles, CA 90046
Attention: Brett Jacobson
Email:brett@mylottolotto.com